Jessica GOMEZ, Alexis Huscko, and Anthony Trujillo,[1] Plaintiffs,

v.

Bob ALLBEE, in his individual capacity; Gail Spies, in her individual capacity; Don Doucette, in his individual capacity; Joan Kindle, in her individual capacity; Deb Sullivan, in her individual capacity; Board of Trustees of Eastern Iowa Community Colleges; and Muscatine Community College, Defendants.

No. 3:15-cv-00048-JEG

United States District Court, S.D. Iowa, Davenport Division.

Signed September 30, 2015

---

1. By this Court's order of September 30, 2015, ECF No. 25, the claims of former Muscatine Community College students Mary Mason, Kayla Benefiel, Mallory Kauffman, Spencer Ludman, Kenzie Failyer, Molly Willson, John Snyder, Brandy Dillon, and Tarsa Weikert were found to be moot, and those named plaintiffs were dismissed from this action.

Mikkie R. Schiltz, Lane & Waterman LLP, Davenport, IA, for Defendant

## ORDER

JAMES E. GRITZNER, Senior Judge, UNITED STATES DISTRICT COURT

This matter comes before the Court on Motion for Preliminary Injunction by Jessica Gomez, Alexis Huscko, and Anthony Trujillo (collectively, Plaintiffs). Defendants Bob Allbee, the president of Muscatine Community College; Don Doucette, chancellor of Eastern Iowa Community Colleges (EICC); Gail Spies, dean of Muscatine Community College; Joan Kindle, a vice chancellor of Eastern Iowa Community Colleges; Deb Sullivan, the human resources and equal employment opportunity officer at Muscatine Community College; the Board of Trustees of Eastern Iowa Community Colleges (Board of Trustees); and Muscatine Community College (collectively, Defendants) resist. The Court held a hearing on the Motion on July 14 and July 15, 2015. Attorneys Bryan K. Clark and Glen Downey were present on behalf of Plaintiffs, and attorney Mikkie Schiltz was present on behalf of Defendants. The Court allowed Defendants to supplement the record as necessary following Plaintiffs' introduction, for the first time at the hearing, of two previously undisclosed recordings.[2] Defendants have now supplemented the record and provided the Court with what the parties agree are complete

2. Plaintiffs' complaint mentions that a meeting between James Compton, the faculty advisor of *The Calumet* during the relevant period, and Muscatine Community College Dean Gail Spies was recorded. The complaint does not indicate that Compton recorded the meeting surreptitiously, nor does it mention that he also recorded an August 2014 conflict resolution meeting. Plaintiffs made the recordings available to Defendants and to the Court at the hearing but had not provided them to

Defendants in advance. At the hearing, Defendants objected to the admission of selected clips from the recordings. The Court heard the evidence subject to the objection and left the record open to allow Defendants to supplement the record regarding the audio recordings. Defendants later supplemented the record with the complete recordings, thus rendering moot Defendants' objection to the clips.

transcripts of the recordings.[3] The Motion is fully submitted and ready for disposition.

## I. SUMMARY OF MATERIAL FACTS

This dispute concerns *The Calumet*, a student-run newspaper at Muscatine Community College (MCC), which is a public institution and a component of the Eastern Iowa Community College District (EICC). Plaintiffs are current students at MCC who were, or continue to be, involved with *The Calumet*.

MCC students have written, produced, and published *The Calumet* since 1951. The Board of Trustees' Policy Regarding Student Publications provides,

> The Board of Trustees supports and encourages student publications as part of the educational process. Students have the right to exercise freedom of speech, including the right of expression in official college publications. Faculty or staff advisors shall supervise the production of official college publications, and student editors shall assign and edit the news, editorial and feature content of their publications.
>
> Students shall not express, publish or distribute materials which are obscene, libelous or slanderous, or which encourage students to commit unlawful acts, violate lawful college regulations, or cause the material and substantial disruption of the orderly operation of the college. There shall be no prior restraint of material prepared for official college publications except when the material violates these restrictions.
>
> Any expression made by students in the exercise of free speech, including in official school publications, shall not be

deemed to be an expression of college policy.

Compton 1st Aff.—Ex. B, Pls.' Mot. Prelim. Inj., ECF No. 5–2.

Plaintiffs argue various events involving articles published in *The Calumet* demonstrate that Defendants violated Plaintiffs' First Amendment rights. Because the Court must assess the totality of the involved communications, rather than selectively emphasizing some over others, some detailed discussion of the material communications will be required.

### A. Equal Employment Opportunity Complaints

Plaintiffs first allege MCC conducted a baseless equal employment opportunity (EEO) investigation in response to an article in *The Calumet*. James Compton (Compton), an MCC faculty member and *The Calumet's* faculty advisor for the 2013–2014 and 2014–2015 academic years, avers that in June 2013, John Dabeet (Dabeet), who was the faculty advisor of the Student Senate at the time, filed an EEO complaint against Compton after Compton "raised concerns about possible conflicts of interest in the Student Senate's Student of the Month selection process." Compton 2d Aff. ¶ 2, Pls.' Reply – Ex. A, ECF No. 9–1. Compton reports that the investigation revealed there was no basis for the complaint. According to MCC President Bob Allbee (Allbee), the EEO officer determined that Compton had not engaged in prohibited discrimination, but that "all parties had demonstrated a lack of professionalism." Allbee Aff. ¶ 4, Defs.' Resist. – Ex. B, ECF No. 8–2. Allbee re-

---

3. The transcripts provided are not certified transcripts and contain nonstandard abbreviations and punctuation marks, including the insertion of ellipsis to indicate pauses taken by the speaker. Because the transcript does not have enumerated lines, citations to quotations from the transcript will be to the page number, ellipsis that appear in the transcript will be parenthetically identified.

portedly directed Compton not to retaliate against Dabeet.

A few months later, in October 2013, then-MCC student and staff member of *The Calumet* Spencer Ludman wrote an article for *The Calumet* suggesting that MCC's Student Senate unfairly presents its own members with the Student of the Month award. The article reported that Loureen Sayej, then-Student Senate president, had won the award twice in 2013 and that Dabeet was both the faculty advisor for the Student Senate and Loureen Sayej's uncle. The article quoted Dabeet's description of the Student of the Month selection process and also quoted MCC's drama instructor's assertions that the happenings at Student Senate meetings were obscure, that the meetings were at an inconvenient time, and that Dabeet had been "under fire for a couple of years now, and he needs to be." Compton's 1st Aff. – Ex. C, Pl.'s Mot. Prelim. Inj., ECF No. 5–2.

Compton asserts that shortly after the October 2013 article went to print, Dabeet filed another EEO complaint against Compton. According to Compton, Dabeet alleged that the Student Senate article "was in some way retaliatory." *Id.* at ¶ 19.

EICC hired an outside investigator to conduct the second EEO investigation. According to Allbee, the investigator "determined Compton was involved in the decision to publish the article, knew it was inflammatory, but [the investigator] could not determine Compton's intent to take retaliatory action." Allbee Aff. ¶ 12, Defs.' Resist. – Ex. B, ECF No. 8–2. Allbee

asserts he "issued a Written Warning to Compton for behavior which was uncovered during the EEO investigation." *Id.* at ¶ 13.

MCC Human Resources Director Deb Sullivan (Sullivan) held a conflict resolution meeting in August 2014,[4] which she attests was intended to defuse the tension between Compton and Dabeet. At the meeting along with Sullivan, Compton, and Dabeet were Allbee and MCC Dean Gail Spies (Spies), as well as Chris Legal and Toby Paone, who were apparently representatives from the Iowa State Education Association.

During the meeting, Dabeet articulated that, although he historically had a good relationship with Compton, the present tensions existed "way before" the Student Senate story in *The Calumet.* Defs.' Suppl. R. Tr. – Ex. B at 14, ECF No. 22–2. Dabeet also described tensions with Compton relating to their participation in their professional association (Iowa State Educators Association).

Early in the meeting, Compton stated that he went to Allbee for help because he "knew the [Student Senate] story wouldn't be received happily." *Id.* at 11. Sullivan asked Compton if there was anything he might do differently next time.[5] Compton responded that if there were another potential story that might hurt the feelings of a coworker, he would work with the students to publish the story objectively, but he would not "violate the rights of the students in my classes." *Id.* at 12. Compton stated that it would not be appropriate for him to directly contact the subject of

---

**4.** As previously noted, this is one of two meetings Compton secretly recorded. The Court has been provided with transcripts of both recordings, as well as copies of the audio recordings.

**5.** Sullivan directed similar questions at Dabeet. For example, Sullivan asked Dabeet if

he would remain in the room during a future vote for the Student of the Month award that could benefit his niece and encouraged Dabeet to avoid anything that could create the appearance of nepotism. Sullivan also recommended that Allbee review MCC's nepotism policy.

an unflattering article, but he would go to the administration so that it might "possibly even make a forum like this [meeting]. Like prior to the story coming out, or something like that to where hurt feelings could be minimized." *Id.* Sullivan expressed that while she understood MCC students have First Amendment rights, she encouraged Compton to keep in mind the college's goal to educate students. During the meeting, Sullivan repeatedly redirected Compton and Dabeet to focus on faculty relationships from a human resource perspective and to discuss how to cultivate a more collegial environment. She proposed whether before the publication of an unflattering article, the parties could meet "to say . . . here's what's coming down the pipe." *Id.* at 17. Sullivan expressed that "[w]e have to communicate" and "put human interests and human feelings first." *Id.*

Compton indicated that he would be willing to have such a meeting, but he could not direct the students not to publish an article simply because it might portray someone negatively. Sullivan later said to Compton that unlike the military, which operates "in black and white," all other organizations "operate in the gray zone," and so Compton "probably did what [he] needed to do . . . [b]ecause that's part of journalism." *Id.* at 17–18. Sullivan continued, "[b]ut in human kind [sic], and doing what's right and doing what's wrong . . . might it have bared [sic] good will to have that conversation with John [Dabeet] before it went out[?]" *Id.* at 18. Compton responded, "Yes, I believe it . . . that's why I went for help." *Id.* (ellipsis in original). Compton indicated that Allbee did not offer to arrange to sit down and talk with Compton and Dabeet.[6]

At the end of the meeting, Sullivan asked Allbee to speak. Allbee framed the

problem as a conflict between Compton and Dabeet with the students caught in the middle. Allbee said that he and other administrators "each had students in our office[s] crying about this last year because they didn't want to pick sides between the two of you [ (Compton and Dabeet) ] because they like both of you and respected both of you." *Id.* at 36. Allbee continued that everyone needed to figure out how to work together.

Allbee acknowledged that Compton approached him before the article came out. Allbee also reported that Dabeet indicated displeasure with the article soon after it went to print. Allbee then said,

> I'm fine with going forward if we want to meet if there's something that we need to meet about. I don't want to meet just for the sake of meeting, but if we have a real need to meet, then let's do that. And, if that needs to be Gail [Spies] or Shelly [Cram Rahlf] or all of us in the meeting, then . . . we will make that happen.

*Id.* (ellipsis in original). Allbee also indicated that he would speak with EICC Chancellor Don Doucette (Doucette) about a conflict of interest policy. Allbee concluded by saying that MCC could not have another tension-filled year and that Compton and Dabeet simply needed to be able to work together.

**B. *The Calumet* Article Picturing Dr. Rick Boyer**

Plaintiffs next contend that Defendants attempted to censor *The Calumet* and then retaliated against its journalists after tensions arose between *The Calumet* and Dr. Rick Boyer (Boyer), MCC's math and science department coordinator, in response to an article about several grants MCC had received, which *The Calumet* publish-

---

**6.** Later in the meeting, Allbee said that he offered to arrange a meeting with MCC Dean of Students Shelly Cram Rahlf to modify the Student of the Month policy.

ed on December 10, 2014. The article mentioned that the science department received a $38,000 grant to purchase equipment and remarked that Boyer "did not return e-mails for comment." Mason Aff. – Ex. A, Pls.' Mot. Prelim. Inj., ECF No. 5–3. Included with the article was a photograph of Boyer. According to Mary Mason (Mason), then-editor in chief of *The Calumet*, after the article was published, Boyer called *The Calumet* office to voice his displeasure about the use of his photograph. Mason attested, and as *The Calumet* later reported, the same picture of Boyer appeared in other media sources. Mason asserts that Boyer aggressively told her that the paper had to obtain consent before using photographs and hung up before Mason could tell him he was incorrect.

On January 14, 2015, Compton sent an email to Sullivan and Doucette to keep them "in the loop regarding anything that can be seen as intimidation of the press for the MCC newspaper." Sullivan Aff. – Ex. A–3, Defs.' Resist., ECF No. 8–1. In the email, Compton described the call from Boyer. Compton also forwarded a letter he had written to Spies and Allbee. Compton asserted that the failure of Spies and Allbee to respond demonstrates "tacit acceptance of Boyer's behavior." *Id.* · Compton demanded that Boyer apologize to Mason, and Compton indicated that he would contact Boyer directly to solicit an apology. He also requested that Sullivan or Doucette facilitate a meeting between Compton and Boyer.

On January 26, 2015, in response Sullivan wrote the following:

Jim,

First of all, thank you for your patience as I worked to learn the perspectives of those involved in the December 10, 2014 incident with the exception of Mary Mason, [the] student who answered the telephone. I have now completed a thorough review of all perspectives and thoughts. As I read your concerns and requests I was disappointed that you did not direct the student to share her concern with the Dean of Student Development, Shelly Cram Rahlf, which is protocol and would have been the proper channel to handle this issue.

Dr. Boyer reacted with frustration to what he perceived as a negative question. While the telephone discussion between Dr. Boyer and Mary Mason may not have been the best means of sharing concerns, in no way was Dr. Boyer's intent to intimidate the Calumet staff. With regard to your concerns that you have not received a response or assurance from Dean Spies or President Allbee that Dr. Boyer "has been spoken to", I'm sure that you understand the leadership of MCC will not discuss personnel issues with other employees. Therefore, I do not find it surprising that you have not received a response from Dean Spies regarding this issue.

At this time I do not feel that a facilitation meeting is warranted. If anyone is due an apology it would be the student the only persons directly involved were the student and Dr. Boyer. If the student continues to have concerns I strongly urge you to direct her to meet with Shelly Cram Rahlf. Honestly, at this point in time it is truly best for all parties to move on. Nothing will be gained by further investigation. If Dr. Boyer is not interested in sharing information for the article, please move on to a different article. As you assured me in an earlier e-mail, a fresh start is first and foremost on your mind. Let's start by putting this behind us and moving forward.

Here's to a great semester!

Deb

*Id.*

Sullivan averred that her suggestion to "move on to a different article" meant that if Boyer did not want to provide information about the grant, *The Calumet* should "move on" as Boyer had no obligation to comment if he did not want to do so. *Id.* Sullivan further attested that because Boyer's call involved a conflict with a student, and not a conflict between Boyer and Compton, she hoped to encourage Compton not to focus on it.

On January 27, 2015, Compton initiated a meeting with Spies by going to Spies' office without an appointment. Compton secretly recorded this meeting. During the course of the hour-long meeting that involved discussion of several matters relating to *The Calumet*, including hiring an adjunct to teach the journalism courses and to advise the newspaper, Spies asked if a story about Boyer's call would appear in the paper. Compton responded, "of course," to which Spies replied, "oh no." Defs.' Suppl. R. Tr. – Ex. A at 11, ECF No. 22–1. Compton expressed that it would be helpful if Boyer would respond to interview requests and to tell his side of the story. Spies said, "What it's going to do is it's going to prolong it. . . . [A]nd it probably will (a) shut down the newspaper; (b) new advisor for the newspaper; or (c) get us all up into the Chancellor's office. . . . And we'll have to deal with it." *Id.* Compton then said, "whatever happens, is whatever happens." *Id.* Spies changed the subject back to finding a new advisor for *The Calumet*, which Compton agreed was desirable and consistent with his expectations. *Id.*

At one point during the meeting with Spies, Compton said, "I really don't know what to do because the only thing that would seem to alleviate [the tension surrounding the paper] would be for me to tell them to not publish anything that any-body could perceive as being critical." *Id.* at 19. Spies replied, "well, we don't want to go there." *Id.* Spies told Compton that she understood he was trying to navigate the tense campus environment, but "if the students run that story about Rick's phone call, everything that I saw in December is going to happen all over again . . . because people are . . . frustrated. . . ." *Id.* at 20 (second ellipsis in original). Compton asked, "what do I do?" to which Spies replied, "I think all you can do . . . is give students all the perspective[s] and the sides . . . unfortunately, we're working with students here so the piece I get [is] that you can't do anything, but to me that's the advisor's job . . . to guide." *Id.* Compton responded that he provided guidance, but the First Amendment limits the extent to which he could discourage student publications. Compton said he could not "hint at saying that this shouldn't be published because there w[ould] be bad feeling[s]. . . ." *Id.* at 21. Spies expressed her general agreement with that sentiment. On February 6, 2015, *The Calumet* published an article titled "Calumet receives curt call," which detailed Boyer's phone call to *The Calumet* office. Mason Aff. – Ex. B, Pls.' Mot. Prelim. Inj., ECF No. 5–3.

On February 10, 2015, Boyer sent an email to MCC faculty and staff telling his side of the story regarding his call to *The Calumet* office. Boyer provided background information surrounding the article about the grant money his department received, which *The Calumet* had published the previous fall. Boyer indicated that before *The Calumet* ran the article about the grant money, he received an email from *The Calumet* staff asking him whether MCC would have provided budget money for the microscopes if his department had not been awarded the grant. Boyer explained that he did not respond to the email because he thought the question con-

stituted a "negative comment about our college and its budgeting." Spies Aff. – Ex. C5, Def. Resist., ECF No. 8–3. Boyer said he received a second email asking how he felt when he received the grant. Boyer indicated that did not answer because he found the question "rather silly." *Id.* Boyer went on to state that when the article came out, his picture appeared next to a remark that he had not returned emails for comment. Boyer parenthetically explained that he did "not like to have my picture taken due to the disability that I have in my neck.... I never take a good picture. I am very self-conscious of this." *Id.* Boyer said he called *The Calumet* office to ask why his picture had been used without his permission. Boyer said he was told that the paper could use any picture for any reason, to which Boyer responded, "not anymore." *Id.*

Spies attested that in February 2015 she spoke with Mason and said that she had already spoken to Boyer about his phone call to *The Calumet.* Spies further stated that she told Mason there might be further conversations with Boyer if Mason made a complaint. Spies noted that Mason never complained to either Spies or Shelley Cram Rahlf (Cram Rahlf).

On March 6, 2015, *The Calumet* published a lengthy response to Boyer's email. The article criticized Boyer and the same picture about which Boyer had previously objected appeared four separate times within the article.

### C. Plaintiffs' Lawsuit

Plaintiffs filed this action on May 5, 2015, pursuant to 42 U.S.C. § 1983, alleging, while acting under color of state law and motivated by a dislike for the contents of *The Calumet,* which they assert is a limited public forum, Defendants infringed Plaintiffs' First Amendment rights. Plaintiffs further allege that Defendants retaliated against them in violation of the First Amendment. Plaintiffs contend that even if some of Defendants' conduct was directed at Compton, the clear intent was to restrict student speech.

### 1. Appointment of an Adjunct Professor as *The Calumet's* Faculty Advisor

Plaintiffs first assert that MCC removed Compton as *The Calumet's* faculty advisor for the 2015–2016 school year because of the February 6, 2015 "curt call" article in *The Calumet.* Compton asserts that *The Calumet* has always had a full-time faculty advisor. He continues that the student newspaper at Clinton Community College, which is also in the EICC system, has a full-time advisor. Spies counters that prior to 2010, a long-term faculty member taught MCC's journalism classes for many years, but since that professor's retirement following the 2009–2010 academic year, the faculty members assigned to advise *The Calumet* have changed based upon the college's and the instructors' needs, and therefore several faculty members have received temporary assignments to advise *The Calumet.*

During their January 27, 2015, meeting, Spies informed Compton she had found a qualified adjunct interested in assuming the journalism instruction responsibilities at MCC. Spies confirmed that Compton did not want to continue as the advisor. Compton agreed that he originally planned on acting as the advisor for one year and "never planned on staying in there forever." Defs.' Suppl. R. Tr. – Ex. A at 12, ECF No. 22. Compton repeatedly expressed that he would appreciate MCC hiring a new advisor for *The Calumet. Id.* Spies expressed concern whether an adjunct would have sufficient time to commit to *The Calumet* and the ability to deal with the fallout from tensions over the paper. Compton noted that he spent sixty hours per week working on the paper and sug-

gested that maybe two adjuncts could handle the journalism responsibilities.[7] Spies said she would consider what she could do. Spies expressed that she needed Compton to return to teaching English classes due to MCC's scheduling demands. In addition, Spies' affidavit provided that MCC has recently been "working towards an initiative to improve English competencies. One strategy to improve English competencies was assignment of consistent and full-time faculty members to teach core English courses." Spies Aff. ¶ 20, Defs.' Resist – Ex. C, ECF No. 8–3. Compton indicated several times that he would enjoy returning to teaching English as he was exhausted by the time commitment of the paper and the tensions on campus. Defs.' Suppl. R. Tr. – Ex. A at 11–12, ECF No. 22 ("I need to be in English. I like English. And this is ... this is the most frustrating like 18 months that I've had um outside of my divorce. I mean it's ... I don't want it, you know, to be completely honest and so, and it would be nice if like the Chancellor opened it up so that you could get like the person.... I like [having an adjunct take over as *The Calumet* advisor]. To be completely honest, that would make life very pleasant for me." (first and second ellipsis in original)). When Spies told Compton that she did not know how Compton felt about staying on as *The Calumet* advisor and that she thought Compton might want to stay, Compton responded, "No" and that he "never planned to stay more than a year." *Id.* at 12. Spies asserts that only later did Compton object to MCC hiring an adjunct to takeover advising *The Calumet.*

## 2. Alleged Cuts to Funding for *The Calumet*

Plaintiffs next allege that because of *The Calumet's* content, the Student Senate cut the paper's 2015–2016 academic year funding. Compton asserts that the Student Senate has historically allocated enough money to *The Calumet* so that, including the money the paper had in its account before the annual allocation, it would begin the year with $10,000.

Student Senate records indicate that in 2008, *The Calumet* received $4500. In 2009, *The Calumet* requested $6000 and received $4300. In 2010, the paper requested and received $5000. In 2011, *The Calumet* received $4000. In 2012, *The Calumet* requested and received $5000. In 2013, the paper requested $15,000 and received $3500. In 2014, the Senate's records indicate that the body did not receive a request from *The Calumet*, and the newspaper did not receive an allocation. In 2015, *The Calumet* requested $14,000 and received $5500.

Compton asserts that he "personally submitted *The Calumet's* budget request for the 20142015 school year ... before the applicable deadline. It was apparently 'lost' at some point thereafter." Compton 2d Aff. ¶ 26, Pls.' Reply, ECF No. 9–1. After Compton inquired about when *The Calumet* would receive its 2014–2015 funding, Cram Rahlf sent an email to Compton noting that when someone collected funding requests from the Student Senate mailbox and delivered them to Cram Rahlf she observed there was no funding request from *The Calumet.* She continued that "On April 1st I oversaw the process of

---

7. A few weeks after his January meeting with Spies, Compton stated in a February 19, 2015, email that he regularly spent *thirty* hours per week on *The Calumet*. Compton also said that after having "had time to think" about his comment that he "never expected to

remain *The Calumet* advisor for more than a year," he did not feel that it would be suitable to hire an adjunct to advise *The Calumet.* Spies Aff. – Ex. C1, Defs.' Resist., ECF No. 8–3.

Senate Members and the allocations of the upcoming funding. It was again noted, which organizations had not turned in forms. *Calumet* again was noted." Allbee Aff. – Ex. B3 (Cram–Rahlf Apr. 25, 2014, email), Defs.' Resist., ECF No. 8–2.

Allbee reports that when he learned in the fall of 2014 that the Student Senate did not allocate any funding to *The Calumet,* Allbee decided to allocate $6800 to the newspaper from other discretionary funds. Allbee asserts that in the spring of 2015, *The Calumet* requested additional emergency finding. Allbee testified that he suggested the paper seek funding from the alumni association. The Student Senate and MCC's alumni association each allocated *The Calumet* an additional $1000.

Compton contends that even a $10,000 allocation would not be enough for *The Calumet* to cover its costs.[8] Accordingly, the paper also sought money from advertising, "emergency funding requests," and independent fundraising efforts. Compton 1st Aff. ¶ 52, Pls' Mot. Prelim. Inj., ECF No. 5–2. Compton asserts that because of its funding needs, *"The Calumet* this year requested a budget of $14,000." *Id.* ¶ at 53. Compton further asserts that the Student Senate only provided *The Calumet* with $5500 and "[n]o reason was given for cutting *The Calumet's* budget by such a significant amount." *Id.* ¶ at 55.

### 3. Class Schedule Changes for the Beginning News Writing Course

Plaintiffs next allege Defendants modified the class schedule for the Beginning News Writing course in order to marginalize *The Calumet.* In recent academic years, the Beginning News Writing course was scheduled on Mondays and Wednes-

days from 1:00 p.m. until 2:30 p.m., which allowed students to take that course while also taking one of the large number of general education or writing and literature courses that meet on Tuesdays and Thursdays. On the schedule for Fall 2015, Beginning News Writing is held on Tuesdays and Thursdays at 10:30 a.m.

Spies asserts that in Fall 2015, Journalism Practicum, the class that publishes *The Calumet,* will meet at the same time that it has met for the last nine semesters. Spies further asserts that both the Monday/Wednesday afternoon time slot in which Beginning News Writing historically has met and its new Tuesday/Thursday time slot are popular with students. She asserts that "[m]ost of the core classes scheduled on Tuesdays and Thursdays have other offerings at different times." Spies Aff. ¶ 26, Defs.' Resist. – Ex. C, ECF No. 8–3.

Spies attests that the scheduling change was partially made to accommodate the newly-hired adjunct's schedule and that faculty members generally have flexibility in setting class times. Spies testified that although only a small number of students have signed up for Beginning News Writing for this Fall, current enrollment numbers are consistent with past numbers and additional students are likely to enroll.

### 4. Comments by Instructor Lange

Plaintiffs further allege that faculty members harassed and attempted to intimidate them. In her affidavit, Kayla Benefiel, staff member of *The Calumet* and also a member of the student organization Phi Theta Kappa, reported that faculty member Brandon Lange (Lange) "was extremely critical of the stories in *The Calu-*

---

**8.** Allbee attested that during Compton's tenure, *The Calumet* began publishing every two weeks with additional pages and in color. Allbee contends that these changes caused *The Calumet* to go over budget. Plaintiffs counter that increased enrollment and increased participation in the newspaper necessitated longer issues so that each student had a chance to participate.

*met* and harassed and intimidated [her] and other members of *The Calumet* who are in Phi Theta Kappa." Benefiel Aff. ¶ 3, Pls.' Mot. Prelim. Inj., ECF No. 5–4. Benefiel asserts she complained about Lange's conduct to MCC's administration.

Spies attests that "[i]n February 2015, I received a complaint from a student regarding comments made by Instructor Lange during Chemistry class. I investigated the complaint and reprimanded Lange about making negative comments about a student activity during class. I received no further complaints." Spies Aff. ¶ 31, Defs.' Resist. – Ex. C, ECF No. 8–3. Similarly, Allbee avers that he was "generally aware" of complaints regarding Boyer and Lange but qualifies that "[n]either Boyer nor Lange have any authority over *The Calumet.*" Allbee Aff. ¶ 23, Defs.' Resist. – Ex. B, ECF No. 8–2. Spies attests that she investigated the complaint about Lange and reprimanded Lange for making negative comments about a student activity during class.

### 5. Grade Appeal Issue

The parties presented evidence regarding a student's grade appeal. Compton asserts that after *The Calumet* published the article about the Student Senate, "one of the students enrolled in Journalism Practicum (who had close friends on the Senate), responded by destroying over 500+ copies of *The Calumet.*" Compton 2d Aff. ¶ 15, Pls;' Reply – Ex. A, ECF No. 9–1. Compton reports he decided to give the student a grade of zero percent for that issue. When the zero grade was combined with the student's other work that semester, the student received a "C" grade for the course. The student filed a grade appeal claiming that Compton lowered the student's grade for objecting to the article's publication. Compton contends that MCC policy is to allow a professor seven days to respond to a student's grade appeal, but Compton "only received the stu-

dent's petition the afternoon before the committee hearing." *Id.* at ¶ 21. Compton continues that two of the members of the grade appeal committee were on the Student Senate and were close friends of the student who filed the grade appeal. Spies counters that along with the students, she and four faculty members were also on the committee and determined the student's grade was "arbitrary and capricious." Spies Aff. ¶ 13, Defs.' Resist. – Ex. C, ECF No. 8–3. Compton postulates, however, that the fact the committee only raised the student's grade to a B indicates that the committee agreed that the student's conduct warranted a grade reduction of some degree.

### D. Plaintiff's Motion for Preliminary Injunction

Plaintiffs filed this motion for preliminary injunction asking the Court to enjoin Defendants, and those acting at the direction of the Defendants, from (1) changing the role of the newspaper advisor from a full-time faculty position to an adjunct position; (2) altering the academic schedule for Fall 2015; (3) cutting funding for *The Calumet;* and (4) encouraging efforts by faculty members to threaten, intimidate, harass, and censor student journalists.

Defendants resist this motion, arguing that an injunction is not an appropriate remedy for Plaintiffs' alleged harm. Defendants assert that they have not implemented any policies, rules, or practices aimed at regulating the content of *The Calumet.* As evidence of a lack of censorship, Defendants point to the continued publication of articles that were critical of Professor Boyer and the MCC administration. Defendants further argue that Plaintiffs cannot show irreparable harm because they already addressed Plaintiffs' allegations regarding comments from faculty.

Defendants further contend it is purely speculative that hiring an adjunct to advise *The Calumet* will limit Plaintiffs' speech and that there is no reason to assume an adjunct will devote less time to the paper than Compton has devoted. Defendants continue that the changes to the schedule for the Beginning News Writing course will not harm Plaintiffs because many of the courses scheduled at the same time as the Beginning News Writing course also meet at other times and furthermore, the Beginning News Writing course is not a requirement to write for *The Calumet.* In addition, Defendants assert they have not cut *The Calumet's* funding nor directed the Student Senate to do so. Finally, Defendants argue an injunction would interfere with MCC's legitimate decisions about how to achieve its academic priorities.

## II. DISCUSSION

### A. Preliminary Injunction Standard

■ "To receive injunctive relief, a movant must establish the following factors: (1) a likelihood of success on the merits; (2) irreparable harm; (3) that the balance of the harms of granting or denying the injunction are in its favor; and (4) that granting the injunction is in the public's interest." *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1,* 690 F.3d 996, 1000 (8th Cir.2012) (citing *CDI Energy Servs. v. W. River Pumps, Inc.,* 567 F.3d 398, 401–02 (8th Cir.2009), and *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc)).

■ "[D]istrict courts should still apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes," *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 732 (8th Cir.2008) (en banc), "with a 'fair chance of prevailing' on the merits, with a 'fair chance' meaning something less than fifty percent," *id.* at 730. However, "[o]nly in a case ... where a preliminary injunction is sought to enjoin the implementation of a duly enacted state [or federal] statute, must district courts make a threshold finding that a party is likely to prevail on the merits." *Id..* at 732–33 (footnote omitted).

> [The Court's] focus on likelihood of success on the merits as a threshold issue should not be construed to lessen the importance of irreparable harm in the *Dataphase* analysis. 'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' Indeed, in some cases, lack of irreparable injury is the factor that should begin and end the *Dataphase* analysis. In this respect, where a duly enacted statute is involved, a likelihood of success on the merits may be characterized as one, but not the only, threshold showing that must be met by a movant for a preliminary injunction.

*Id.* at 732 n. 5 (internal citations omitted) (quoting *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)); *see also Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (same); *Packard Elevator v. I.C.C.,* 782 F.2d 112, 115 (8th Cir.1986) (same).

■ "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Rogers Grp., Inc. v. City of Fayetteville, Ark.,* 629 F.3d 784, 789 (8th Cir. 2010) (quoting *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir.2003)). "When there is an adequate remedy at law, a preliminary injunction is not appropriate." *Watkins,* 346 F.3d at 844. "[T]he burden on the movant is heavy, in particular where ... granting the preliminary injunction will give [the movant] substantially

the relief it would obtain after a trial on the merits." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir.1998) (third alteration in original) (quoting *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485–86 (8th Cir.1993)).[9]

## B. Likelihood of Success on the Merits

 Although Defendants assert that they can permissibly impose curricular limitations on *The Calumet*, the parties agree that *The Calumet* is a limited public forum. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). A state instrumentality, such as MCC, may confine a limited public forum "to the limited and legitimate purposes for which it was created." *Id.* at 829, 115 S.Ct. 2510. "Once it

has opened a limited forum, however, the [state instrumentality] must respect the lawful boundaries it has itself set." *Id.*

 The First Amendment prohibits administrators from imposing content-based restraints or taking adverse action against student newspapers, "including engaging in conduct designed to chill the speech contained in future editions, on the basis of the views expressed in the publication unless such action served a compelling government interest." *Husain v. Springer*, 494 F.3d 108, 125 (2d Cir.2007); *see also Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir.1983) ("A public university may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper."). Defendants assert they have not imposed content-based restrictions on *The Calumet* (other than those articulated in the Board policy) or taken adverse action against the paper.[10]

---

**9.** Plaintiffs cite *United States v. Playboy Entertainment Group*, 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000), for the proposition that "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." Unlike the *Playboy* case, which challenged a statute regulating sexually-oriented cable television, Defendants in this case are not arguing that they lawfully restricted Plaintiffs' speech. Rather, Defendants argue that they did not restrict Plaintiffs' speech. At this stage, Plaintiffs bear the burden to show they are entitled to preliminary relief.

**10.** The parties dispute whether *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), applies in the college context. In *Kuhlmeier*, the Court held that so long as schools do not open a high school newspaper up for "indiscriminate use," educators can constitutionally exercise editorial control over the paper if "their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 270, 273, 108 S.Ct. 562.

This Court does not need to resolve this quarrel because there is no dispute here that

*The Calumet's* speech is constitutionally protected and because Plaintiffs are not challenging curricular limitations on their speech. *See Husain*, 494 F.3d at 124 (noting, although the application of *Kuhlmeier* varies among the circuits, "*all* the circuits that have considered the issue have determined that, at the very least, when a public university creates or subsidizes a student newspaper and imposes no *ex ante* restrictions on the content that the newspaper may contain, neither the school nor its officials may interfere with the viewpoints expressed in the publication without running afoul of the First Amendment"). Although on this record, Defendants' ultimate authority over *The Calumet* is not completely settled because the students can, but do not necessarily, receive academic credit for writing for *The Calumet* and the paper is apparently part of the journalism curriculum, Defendants have presently disclaimed placing any *ex ante* restraints other than those articulated in the Board policy, and Plaintiffs have not shown evidence of such restraints on the content of *The Calumet*. Thus, the issue presented in this case is whether in fact Defendants restrained or retaliated against Plaintiffs.

As noted, Plaintiffs also contend that Defendants retaliated against them for exercising their First Amendment rights. The Eighth Circuit has "recognized that '[r]etaliation by a government actor in response to ... an exercise of First Amendment rights forms a basis for § 1983 liability.'" *Williams v. City of Carl Junction, Mo.,* 480 F.3d 871, 874–75 (8th Cir.2007) (first alteration in original) (quoting *Naucke v. City of Park Hills,* 284 F.3d 923, 927 (8th Cir.2002)). In general, there are three elements of a First Amendment retaliation claim. The Plaintiffs must show they "engaged in [a] constitutionally protected activity, that [the state entity's] adverse action caused [them] to suffer an injury which would 'chill a person of ordinary firmness from continuing ... in that activity,' and that the adverse action was motivated in part by ... exercise of [their] constitutional rights.'" *Naucke,* 284 F.3d at 927–28 (fourth and fifth alterations in original) (quoting *Carroll v. Pfeffer,* 262 F.3d 847, 850 (8th Cir.2001)). Courts must determine whether "similarly situated person[s] of 'ordinary firmness' reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *Id.*

As described, Plaintiffs allege Defendants conducted a baseless EEO investigation of Compton in order to chill or retaliate against Plaintiffs' speech. Initially, it is significant that the EEO investigation does not appear to have actually chilled Plaintiffs' speech. Plaintiffs continued to publish articles that were critical of MCC faculty after the EEO investigation. Other student journalists of ordinary firmness would likely react the same way. *See id.* (finding the embarrassment, humiliation, and emotional distress the plaintiff allegedly suffered as a result of the city administrator's actions toward the plaintiff for speaking out against the city council's changes to the fire department, which included a public audit of the fire department auxiliary group of which the plaintiff was president, scolding the plaintiff at city council meetings, calling the plaintiff names, and circulating a letter suggesting one of plaintiff's children was fathered by the city administrator, "would be insufficient to deter a person of ordinary firmness from continuing to speak out" and noting that "in the face of these comments, [the plaintiff] continued to speak out against [the city administrator] and the [c]ity [c]ouncil on numerous occasions").

In addition, on the current record, Plaintiffs have not demonstrated a likelihood of success in showing that the EEO investigation was an adverse action against Plaintiffs or that Defendants conducted the investigation in order to chill or retaliate against Plaintiffs' speech. Although Plaintiffs contend that Defendants failed to precisely follow the procedure outlined in the EEO policy, Plaintiffs acknowledge that under the circumstances, Defendants' policies obligated Defendants to conduct an EEO investigation. The EEO complaint against Compton might have arisen out of a misunderstanding of Compton's role as the faculty advisor of *The Calumet* and an independent investigator did not conclude that Compton intended to retaliate against Dabeet. However, in light of the prior tensions between Compton and Dabeet, the record supports a finding that the complaint was not frivolous. In addition, Defendants properly emphasize that although the investigator asked students to participate in the investigation, they were not the subject of the investigation nor were they required to participate. In fact, several students declined to participate without adverse consequences. This evidence runs counter to Plaintiffs' contentions that the EEO investigation was an adverse action against them, that Plaintiffs' speech was a motivating factor in

Defendants' decision to investigate the EEO complaint, and that Defendants' conduct would chill the speech of persons of ordinary firmness in Plaintiffs' position.

█ Plaintiffs place special emphasis on the August 2014 conflict resolution meeting involving Compton and Dabeet. Although Compton, who was the only person that knew the meeting was recorded, emphasized the Student Senate article as the root of his dispute with Dabeet, statements of other participants at the meeting make it clear that the tension between the two professors was broader than, and predated, the newspaper story. In addition, several participants commented that they hoped to resolve the long-running conflict between the two educators. These facts weaken Plaintiffs' contention that the intent of the meeting was to censor Plaintiffs' speech.

Significantly, students were not involved in the August 2014 meeting. Nor is there any indication that Defendants intended students to find out about the meeting. Rather, Sullivan said the meeting was a "very confidential thing." Suppl. R. Tr., Ex. B at 14, ECF No. 22–2. at 35. This further weighs against Plaintiffs' argument that Defendants intended for Compton to direct Plaintiffs to modify their speech or that the meeting would chill persons of ordinary firmness in Plaintiffs' position.

█ As laid out thoroughly above, some of Sullivan's comments suggest Compton should consider others' feelings and meet with subjects of potentially un-

favorable stories. While college administrators generally cannot forbid student publications from criticizing professors or administrators, see Stanley, 719 F.2d at 282,[11] on the current record, Plaintiffs are not likely to succeed in demonstrating that Defendants acted to restrict or retaliate against Plaintiffs' speech since it was Compton who originated the idea of holding the August 2014 meeting in anticipation that his coworkers might be offended by a forthcoming story. Sullivan considered the idea and discussed it at length, but in no way did she set forth a requirement for Compton to direct Plaintiffs to shape articles in order to appease faculty members' objections.

Allbee's statements during the conflict resolution meeting further weaken Plaintiffs' likelihood of success on the merits. Allbee confirmed that Compton approached him before The Calumet published the Student Senate article. There is no indication that Allbee attempted to stop or modify the article despite Allbee having said in the conflict resolution meeting that he knew the article would upset Dabeet. Finally, Allbee said he would be willing to meet with Compton and Dabeet if the two had similar issues in the future. These statements are inconsistent with Plaintiffs' assertion that Defendants required Compton or Plaintiffs to clear potentially offensive articles with Defendants. In sum, Plaintiffs have not demonstrated a likelihood of success in showing that the EEO investigation nor the conflict resolution

11. Notably, Defendants have more flexibility in regulating the speech of its employees. *See Hemminghaus v. Missouri,* 756 F.3d 1100, 1113–14 (8th Cir.2014) (noting that when balancing the competing interests of government employers in efficient operation and citizen employees in speech, the court is to consider six broad factors (citing *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968))). Here, Plaintiffs do not contend that Compton was the speaker or that Defendants could not limit his speech in some circumstances to maintain harmony in the work place. Plaintiffs contend that Defendants unconstitutionally limited *student* speech. *See Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510 (noting that even when a public university funds student speech, that speech, which is not government speech, has full First Amendment protection if the students are speaking within the bounds of the limited public forum).

meeting infringed Plaintiffs' rights or were conducted in retaliation for Plaintiffs' speech.

■ Nor on the current record have Plaintiffs demonstrated a likelihood of success in showing that comments made by Boyer, Sullivan, and/or Spies regarding the Boyer articles violated Plaintiffs' First Amendment rights or amounted to retaliation. It is undisputed that Boyer had no authority to control *The Calumet* at the time of the events at issue.[12] Boyer is not a party to this lawsuit. In addition, it is clear that Boyer's "curt call" did not restrict Plaintiffs' speech; instead, it significantly escalated Plaintiffs' published criticism of Boyer. After the call, Plaintiffs republished the same photograph that upset Boyer no less than four times within the same article. Seemingly in recognition of the fact there was no chilling effect, Plaintiffs argue that they are more tenacious than average student journalists and that Boyer's call and the administration's response would have chilled persons of ordinary firmness in their position. The Court does not discount Plaintiffs' tenacity, but nor does the Court modify the standard. The Court finds it unlikely that Plaintiffs will demonstrate that even student journalists of ordinary firmness in Plaintiffs' position would have been chilled by a negative reaction and vocal complaint from a faculty member with no control over their paper.[13]

Some of Spies' comments indicate that she feared an additional article about Boyer would produce a negative reaction that may include calls to shut down *The Calumet* or to replace Compton as a faculty advisor. However, these comments were made in the context of a long meeting that Compton initiated without notice and secretly recorded. On this record, Spies' comments, viewed in total and in context rather than selectively, can be viewed as little more than her opinion of how others might react to a publication of an article criticizing Boyer's call and not as a clear prior restraint on *The Calumet*. Spies made several statements during that meeting acknowledging that it would be improper to forbid the students from writing articles that others might perceive as critical. Spies may have questioned the newsworthiness of the "curt call" story, but articulated that as *The Calumet* advisor, all Compton could do was provide the students with perspective and guidance. Spies' comments in no way restrained the content of Plaintiffs' speech. Therefore, Plaintiffs have not demonstrated a likelihood of success in showing that Spies took adverse action or retaliated against Plaintiffs based on their speech.

Similarly, Sullivan's January 26, 2015, email suggesting to "move on to a different article," Sullivan Aff. – Ex. A–3, Defs.' Resist., ECF No. 8–1, did not in fact restrain Plaintiffs' speech. Sullivan testified that when she wrote the email, she did not know about the plans to publish a second article about Boyer. Sullivan testified she was attempting to convey that Boyer was not obligated to respond to an interview request about the receipt of grant money if he did not want to respond. Given her testimony at the hearing and the content of the email itself, it is a reasonable interpretation that Sullivan's email was a re-

---

12. At the time the articles about Boyer and his "curt call" were published, Boyer was not an administrator. Boyer was promoted to interim dean of instruction after the publication of the article; however, he was selected for that position prior to the publication. Neither party asserts that this position will give him authority to regulate *The Calumet*.

13. For the same reason, Plaintiffs have not demonstrated a likelihood of success in showing that the comments of Instructor Lange violated Plaintiffs' First Amendment rights.

flection of her opinion, from the standpoint of a human resources director, that it would minimize faculty tensions for Compton to "move on" rather than to confront Boyer or to insist on an administrator-facilitated meeting. Sullivan testified she has no contact with students and she did not intend to restrict students' speech.

It requires characterization to ascribe full meaning to Sullivan's "move on" comments. Does it mean move on without Dr. Boyer's participation, move on from the personnel controversy though not the story, move on to the next story in the same series, or move on and not publish the story? The answer is elusive on this record. In any event, Plaintiffs did not move on to another story. Instead, they wrote an article about Boyer's phone call to *The Calumet,* and to further demonstrate their criticism of Boyer, in four places within the article, they again published the photo Boyer found offensive. The Court finds Plaintiffs unlikely to succeed in showing Sullivan's email constitutes an adverse action against them or that a student journalist of ordinary firmness in Plaintiffs' position would be chilled by Sullivan's email.[14]

◼◼◼◼ Plaintiffs further allege that Defendants appointed an adjunct to advise *The Calumet* in order to restrict Plaintiffs' speech or to retaliate against them. A college's decision regarding the allocation of its full-time faculty is the type of decision courts ordinarily should decline to review, even if the Court doubts that an adjunct would be able to dedicate the same level of commitment to a course or extracurricular activity as a full-time professor. *See Widmar v. Vincent,* 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ("Nor do we question the right of the University to make academic judgments as to how

best to allocate scarce resources or 'to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'" (quoting *Sweezy v. New Hampshire,* 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in result))). Although public colleges cannot take adverse actions against students because of their protected speech, *Stanley,* 719 F.2d at 282, judicial review of genuinely academic decisions is limited "to whether the decision was based on a prohibited factor" such as discrimination or retaliation against protected speech. *Wagner v. Jones,* 664 F.3d 259, 269 (8th Cir.2011) (quotation marks and citation omitted).

In support of their contention that the decision to hire an adjunct to advise *The Calumet* was indeed such a prohibited adverse action motivated by Plaintiffs' speech, Plaintiffs point to Spies' statement that additional articles about Boyer would lead to Compton's replacement as faculty advisor, to the publication of the "curt call" article about a week later, and then to Spies' email five days later notifying Compton that she had located an adjunct to teach the journalism courses in the fall of 2015. Doucette refuted any link between these events testifying that adjuncts are common in higher education. He continued that EICC institutions hire adjuncts because of budget constraints and adjuncts' real-world expertise. Doucette indicated that while it may not be common at MCC for adjuncts to advise extracurricular activities, it is common at other institutions. Doucette, and other witnesses, testified that the adjunct tapped to advise *The Calumet* has significant journalism experience. Allbee also testified that ad-

---

**14.** Mason testified that it was not up to Sullivan what Plaintiffs put in the newspaper. The Court concludes students of ordinary firmness in Mason's position would rightly agree with her.

juncts are common at MCC. Indeed, Allbee suggested there may be more adjuncts at MCC than full-time faculty members.

It is undisputed that Sullivan located a potential adjunct to advise *The Calumet* before the publication of the "curt call" article. There is also no dispute that Spies confirmed with Compton, who likened the eighteen months he spent as *The Calumet* advisor as the most frustrating thing he had experienced aside from his divorce, that he did not expect nor desire to stay on as *The Calumet* advisor. While Spies expressed concern during her meeting with Compton about the ability of an adjunct to handle the time commitment and potential stress of *The Calumet*, Spies also discussed the scheduling challenges in the English department and the need for Compton to return to teaching English.[15] Even if the Court were to find that Plaintiffs met their burden of showing that hiring an adjunct professor as advisor to *The Calumet* was "partly actuated by an impermissible motive," at this point in the proceedings Defendants have demonstrated "by a preponderance of the evidence that [MCC] would have taken the same action anyway for a separate and legitimate reason," namely because MCC needed Compton to return to teaching English, which Compton historically taught. *Stanley*, 719 F.2d at 282 n. 5 (applying the rule articulated in *Mount Healthy School District Board of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), that in the First Amendment context, if the plaintiff shows that plaintiff's constitutionally protected conduct was a motivating factor in the defendant's actions, the defendant has the burden of showing by a preponderance of the evidence that absent the impermissible reason, it would have taken the action for a separate and legitimate reason). On this record, it is unlikely Plaintiffs will succeed in showing that Defendants selected an adjunct to advise *The Calumet* in order to restrain or retaliate against Plaintiffs' speech.

■ Similarly, the Court finds that it is unlikely Plaintiffs will establish that the Beginning News Writing course schedule change was intended to restrict or retaliate against *The Calumet*. Defendants have asserted—and Plaintiffs have not rebutted—that the Beginning News Writing course is not even a requirement to participate in *The Calumet* and that the schedule change would have a minimal impact on the named Plaintiffs. Even viewed generously, changing the schedule of a course that is not required for participation in the paper to a time slot that conflicts with other popular courses "is far too speculative to establish an objectively reasonable chilling effect." *Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 622 (8th Cir.2012). There is no evidence that MCC changed the time of the Beginning News Writing course to restrict or retaliate against *The Calumet*.

■ Plaintiffs have also failed to demonstrate a likelihood of success on the claim that Defendants cut *The Calumet's* funding in order to limit, or retaliate against, Plaintiffs' speech. The circum-

---

**15.** Plaintiffs stress that adjunct professors are at-will employees who lack the same job security protections as full-time professors. Except to the extent permissible under the test established in *Pickering*, 391 U.S. at 563, 88 S.Ct. 1731, public education institutions cannot take adverse action against any faculty member on account of his or her speech on a matter of public concern. *Hemminghaus*, 756 F.3d at 1113–14; *Wagner*, 664 F.3d at 269 ("The state can neither directly nor indirectly interfere with an employee's or potential employee's rights to association and belief."); *see also Adams v. Trs. of the Univ. of N.C.–Wilmington*, 640 F.3d 550, 565 (4th Cir. 2011) (reversing summary judgment to a university on an associate professor's claim of First Amendment retaliation).

stances here are fundamentally distinguishable from those in *Stanley v. Magrath*, 719 F.2d at 282. First, in this case, the Student Senate allocates funds for student activities, including *The Calumet.* Defendants contend, and Plaintiffs do not refute, that Defendants do not control the Student Senate's funding allocations. In *Stanley*, on the other hand, the University of Minnesota Regents handled the student newspaper's funding and changed the funding method for the student-run newspaper and other student publications in response to a controversial publication in the newspaper. *Id.* The *Stanley* court found the student editor plaintiffs had met their burden of demonstrating that the funding method change was an adverse action, that it created a chilling effect, and that it was substantially motivated by the content of the newspaper's controversial humor issue and thus held that the university's actions violated the First Amendment. *Id.* Here, Plaintiffs have produced no evidence Defendants changed MCC's funding allocation method. Moreover, Plaintiffs failed to demonstrate that *The Calumet* funding was cut or otherwise adversely impacted in any way. To the contrary, when Allbee learned the Student Senate did not fund *The Calumet* for the 2014–2015 school year, he allocated $6800 to *The Calumet* from another source. This allocation is *more* than the Student Senate granted to *The Calumet* in any year between 2008 and 2015. Plus, later in the 2014–2015 academic year, the Student Senate and the alumni association each granted *The Calumet* an additional $1000. For the 2015–2016 school year, the Student Senate allocated $5500 to *The Calumet.* While $5500 is significantly less than the $14,000 *The Calumet* requested, it is more than the Student Senate allocated to the newspaper at any previous time. *The Calumet* requested more than $5000 every academic year since 2008 but routinely received significantly less than the requested amount. Notably, in 2013, prior to any of the events at issue in this litigation, *The Calumet* requested $15,000 but received only $3500. Plaintiffs have failed to demonstrate an adverse action in regard to funding and they are, therefore, unlikely to succeed in showing Defendants violated their First Amendment rights in that regard.

Finally, Plaintiffs did not make an argument in their opening brief or during the hearing that the grade appeal process involving Compton violated Plaintiffs' First Amendment rights. Rather, only in their reply do Plaintiffs hint that the grade appeal process is further evidence of Defendants' improper motivations, yet they do not point to any evidence that the grade appeal process chilled protected speech or was an adverse action against Plaintiffs motivated by their protected speech. Accordingly, Plaintiffs are unlikely to succeed in showing that the grade appeal violated their First Amendment rights.

In sum, given the current record, Plaintiffs are unlikely to show that Defendants' conduct, even if viewed collectively, constituted adverse action against Plaintiffs, or that Defendants' actions were designed to chill or retaliate against Plaintiffs' speech. Thus, the first factor of the *Dataphase* test weighs against the issuance of preliminary injunctive relief.

### C. Irreparable Harm

In order to obtain a preliminary injunction, Plaintiffs must demonstrate irreparable harm and failure to do so requires the preliminary injunction be denied. *Watkins*, 346 F.3d at 844; *Dataphase*, 640 F.2d at 114 n. 9. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion).

Yet, "[t]o succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir.2012) (quotation marks and citations omitted). The irreparable harm factor weighs against issuing a preliminary injunction when a harm has already occurred and can be remedied through damages. *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir.2009).

■ The Court finds that Plaintiffs have not demonstrated that allowing Defendants to hire an adjunct to advise *The Calumet·* will inflict irreparable harm on Plaintiffs. Even if an adjunct may not be able to dedicate as much time to *The Calumet* as Compton did, there is no evidence this would prevent the paper from expressing a certain viewpoint.

Similarly, there is little evidence that a change in the schedule for Beginning News Writing will harm Plaintiffs or *The Calumet*. In fact, Defendants contend without refutation from Plaintiffs that enrollment in Beginning News Writing is about the same as it has been in past years.

Likewise, Plaintiffs failed to demonstrate they will suffer irreparable harm if the Court does not enjoin Defendants from cutting, or directing the Student Senate to cut, *The Calumet's* funding. Whatever the cause of the initial lack of funding from the Student Senate for the 20142015 school year, Allbee took steps to ensure *The Calumet* received funding. Although Plaintiffs received less funding than they requested in 2015, the evidence suggests the Student Senate allocated more funding to *The Calumet* for the 2015–2016 school year than the Senate ever had allocated in the past.

■ In addition, assuming, arguendo, the comments of Sullivan, Spies, Boyer, or Lange were adverse actions against Plaintiffs in violation of their First Amendment rights, Plaintiffs have failed to demonstrate a reasonable threat of future harm. A mere "theoretical possibility" of future harm is not sufficient to warrant injunctive relief; Plaintiffs must show it is a "demonstrated probability." *See McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1211 (8th Cir.1992) (citations omitted); *see also S.J.W. ex rel. Wilson*, 696 F.3d at 778; *CDI Energy Servs.*, 567 F.3d at 403. For the reasons discussed, and given Defendants' avowed support of the paper's editorial freedom, the Board of Trustees' policy regarding student publications, and Plaintiffs' demonstrated willingness to challenge any future violation of their rights, the Court finds that Plaintiffs will not suffer irreparable harm in the absence of preliminary injunctive relief.

### D. Balance of Harms

■ Although the Court's conclusions regarding likelihood of success on the merits and irreparable harm are enough to end the inquiry, the Court nonetheless finds the balance of harms factor also weighs against preliminary injunctive relief. Enjoining Defendants from hiring an adjunct to teach the journalism courses at MCC would likely harm Defendants. Both Compton and Spies suggested that MCC has been searching for a qualified journalism professor for several years. If MCC were enjoined from hiring the prospective adjunct, MCC would be required to start its search anew. Although replacing a full-time faculty member with an adjunct might impact students and *The Calumet*, it is not the Court's role to direct how Defendants allocate their scarce resources. *Widmar*, 454 U.S. at 276, 102 S.Ct. 269. Moreover, given the parties' apparent agreement that the student editors of *The*

*Calumet* are entitled to make the final publication decisions at the paper, there is no evidence in the record that hiring an adjunct to advise *The Calumet* will limit Plaintiffs' protected expression.

As discussed, there is little evidence that changing the schedule for Beginning News Writing will harm Plaintiffs. On the other hand, Defendants attested that the schedule change was made, at least in part, to accommodate the adjunct they intend to hire. Thus, enjoining the schedule change could result in Defendants losing the adjunct candidate and requiring an additional search for available faculty members.

Nor is there evidence Defendants cut funding to *The Calumet*. Rather, the evidence suggests *The Calumet* received a record high level of funding from the Student Senate for this academic year.

Finally, complained of negative comments made by MCC faculty about *The Calumet* occurred in the past, the administration reprimanded the faculty regarding the negative comments, and Plaintiffs continued to publish articles critical of faculty and the administration without restraint or retaliation. The negative comments detailed by Plaintiffs were not made by Defendants, and therefore any harm to Plaintiffs based upon Defendants potentially making negative comments in the future is purely speculative. Accordingly, the balance of harms factor weighs against granting the preliminary injunction.

### E. Public Interest

▉ The final *Dataphase* factor is whether an injunction would be in the public interest. The Supreme Court has articulated that it is generally not in the public interest for courts to second-guess the academic decisions of a college or university. *See Widmar,* 454 U.S. at 276, 102 S.Ct. 269. Although the public interest strongly favors the freedom of students to engage in protected speech on college cam-

pus, *Rosenberger,* 515 U.S. at 835–36, 115 S.Ct. 2510, Plaintiffs have not demonstrated that they are likely to show Defendants took action to chill or retaliate against the exercise of Plaintiffs' First Amendment rights. Thus, the public interest does not tip in favor of granting the injunction.

### III. CONCLUSION

For the foregoing reasons, the Court must **deny** Plaintiffs' Motion for Preliminary Injunction, ECF No. 5.

**IT IS SO ORDERED.**