719 F.2d 279
 14 Ed. Law Rep. 75, 9 Media L. Rep. 2352
 Catherine M. STANLEY, Jeffrey A. Goldberg, Michael Douglas,
and Christopher Ison, each individually and as Editors of
The Minnesota Daily, The Minnesota Daily, and The Board of
Student Publications, Appellants,
v.
C. Peter MAGRATH, individually and as President of the
University of Minnesota, and Charles H. Casey, William B.
Dosland, Erwin L. Goldfine, Lauris D. Krenik, Robert Latz,
David M. Lebedoff, Charles F. McGuiggan, Wenda Moore, Lloyd
H. Peterson, Mary T. Schertler, Neil C. Sherburne, Michael
W. Unger, Verne Long, Willis Drake, and David Roe, each
individually and as a member of the Board of Regents of the
University of Minnesota, Appellees.
 No. 83-1058.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 14, 1983.
Decided Oct. 11, 1983.
 
 Tanick & Heins, Marshall H. Tanick, Samuel D. Heins, Minneapolis, Minn., for appellants.
 Amy Silberberg, Legal Counsel, Minnesota Civil Liberties Union, Minneapolis, Minn., amicus curiae brief of The Minnesota Civil Liberties Union and The Associated Collegiate Press; Owen Gleason, Eden Prairie, Minn., of counsel; Steven Daily and Chris Kobin, MCLU Volunteer Law Students.
 Leonard J. Keyes, Terence N. Doyle, Bruce W. Mooty, St. Paul, Minn., for appellees; Stephen S. Dunham, R. Joel Tierney, Minneapolis, Minn., of counsel.
 Before LAY, Chief Judge, SWYGERT,* Senior Circuit Judge, and ARNOLD, Circuit Judge.
 ARNOLD, Circuit Judge.
 
 
 1
 At the end of the 1978-79 school year, the Minnesota Daily, the student newspaper of the Twin Cities campuses of the University of Minnesota, published an especially controversial issue. The Board of Regents, the governing body of the University, later changed the method of funding the newspaper. In the past, a compulsory fee had been exacted from every student to support the Daily. The Board voted to allow students to obtain a refund of this fee. Its stated reason was solicitude for students who objected to buying a newspaper they did not want. Our study of the record, however, leaves us with the definite and firm conviction that this change in funding would not have occurred absent the public hue and cry that the Daily's offensive contents provoked. Reducing the revenues available to the newspaper is therefore forbidden by the First Amendment, as made applicable to the states by the Fourteenth, and the Daily is entitled to an injunction restoring the former system of funding.[1]
 
 I.
 
 2
 In June 1979 the "Finals Week" edition or "Humor Issue" of the Minnesota Daily, styled in the format of sensationalist newspapers, contained articles, advertisements, and cartoons satirizing Christ, the Roman Catholic Church, evangelical religion, public figures, numerous social, political, and ethnic groups, social customs, popular trends, and liberal ideas. In addressing these subjects, the paper frequently used scatological language and explicit and implicit references to sexual acts. There was, for example, a blasphemous "interview" with Jesus on the Cross that would offend anyone of good taste, whether with or without religion. No contention is made, however, that the newspaper met the legal definition of obscenity.
 
 
 3
 This issue generated vehement criticism. Members of the Board of Regents and University administrators received numerous letters deploring the content of the "Humor Issue" from church leaders, members of churches, interested citizens, students, and legislators, who in many cases were responding to the complaints of constituents. On June 8, 1979, the Regents unanimously passed a resolution stating that they were "compelled to deplore the content of the June 4-9, 1979 issue of the Minnesota Daily." University President C. Peter Magrath sent this resolution to the acting president of the Board of Student Publications, stating that "the Regents will want some accounting as to what corrective action is contemplated in response to their resolution."
 
 
 4
 In another resolution passed unanimously on July 13, 1979, the Regents stated that the issue in question was "flagrantly offensive" and established an ad hoc committee "to review with the President the concerns expressed and the recommendations of the President regarding the Minnesota Daily." Among other things, the Regents directed the special committee to consider the "appropriate mechanism for circulation and financial support for the Minnesota Daily."At a meeting of the Regents in August 1979, the ad hoc committee made its report. The committee recommended that the Regents not take any action at that time to change the funding of the paper. In support of its recommendation, committee members stated that the fees issue should be left to the normal funding procedure, under which student committees and the administration would make recommendations on which the Board would vote in May 1980.[2] They also offered the opinion of the University attorney that changing the fees immediately following the "Humor Issue" could be viewed as punitive action in violation of the First Amendment. The committee's resolution was passed, although several Regents expressed their unhappiness with waiting until May of the next year to take action on changing the funding.
 
 
 5
 Meanwhile, both houses of the Minnesota Legislature held committee hearings regarding the "Humor Issue." The Senate Committee on Education met on June 25, 1979, and the House Education Committee, Higher Education Division met on November 14, 1979. In December, the House committee chairman wrote the chairman of the Board of Regents stating that the vast majority of the Division recommended that the "Regents allow students a means to withdraw their individual financial support from the Daily."
 
 
 6
 In March of 1980, the Student Services Fees Committee, composed of elected students, faculty members, and administrators, recommended by a 6-5 vote that a refund system not be instituted and in addition that the Board of Publications Fees be increased by 11.6%. In April, the President sent the Regents his recommendation in favor of a refundable fee. Following the release of this recommendation, the Twin Cities Campus Assembly voted 99-7 against changing to a refundable fee.
 
 
 7
 On May 9, 1980, the Board of Regents passed, by an 8-3[3] vote, a resolution that instituted a refundable fee system for a one-year trial period, allowing objecting students to obtain a refund of that part of the service fee allotted to the Board of Student Publications. The resolution also increased the Board of Student Publications fee from $1.80 to $2.00 for the 1980-81 school year. In May of 1981 and again in May of 1982, the Board voted in favor of retaining the refund system and on both occasions also raised the Board of Student Publications fee, from $2.00 to $2.12 in 1981 and from $2.12 to $2.56 in 1982.
 
 
 8
 Catherine M. Stanley, Jeffrey A. Goldberg, Michael Douglas, and Christopher Isom, former editors of the Daily, the Daily itself, and the Board of Student Publications then brought this suit against the President of the University and the Members of the Board of Regents in their individual and official capacities. They claimed, among other things, that the Regents' change of policy affected the Daily adversely and that it was motivated by public opposition to the contents of the "Humor Issue." After trial to the court, the complaint was dismissed. The District Court's key finding was that "[o]ne of the motivations for establishment of the refundable fee system was to respond to the concerns of those students who objected to being coerced into giving financial support to the Daily," Catherine M. Stanley v. C. Peter Magrath, No. 3-80-452, slip op. at 8 (D.Minn. December 28, 1982). It added that the Regents' action was "rational," id., and held that the First Amendment had not been violated. This appeal followed.
 
 II.
 
 9
 Plaintiffs claim that the Regents' decision to institute the refundable fee system for the Board of Student Publications was in response to the content of the "Humor Issue" and hence violates the First Amendment. A public university may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper. Joyner v. Whiting, 477 F.2d 456, 460 (4th Cir.1973); Antonelli v. Hammond, 308 F.Supp. 1329, 1337-38 (D.Mass.1970); cf. Papish v. University of Missouri Curators, 410 U.S. 667, 670-71, 93 S.Ct. 1197, 1199-1200, 35 L.Ed.2d 618 (1973) (invalidating student's expulsion that was motivated by disapproval of contents of newspaper that student distributed on campus). Thus, to prevail on their First Amendment claim, the plaintiffs must show that the Regents' decision was adverse and that the decision was substantially motivated by the content of the newspaper. See Givhan v. Western Line Consolidated School Dist., 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); Mt. Healthy School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).
 
 
 10
 The District Court emphasized at several points that the refund system, when considered in the context of the simultaneous increases in the amount of the publications fee, did not reduce the total amount of the Daily's fee support. Slip op. at 7, 8, 18. The Court reached this conclusion by comparing the amount received from student fees in the year prior to the funding change (1979-80) to the amount received in the year following the funding change (1980-81). Despite the money lost due to refunds, the amount received in 1980-81 was $15,826.22 greater than the amount received in 1979-80, because the Regents had raised the Board of Student Publications fee from $1.85 to $2.00. In addition, the amount received in 1981-82 was $14,914.57 greater than that received in 1980-81, because of a further increase in the fee.
 
 
 11
 We conclude nevertheless that the Daily has suffered an injury in fact. Although the total amount of fee support has risen, it has concededly risen less because of the change to refundability. The beginning point for the Regents' action was the recommendation of the Student Service Fee Committee that the fee be increased to $2.00 and that no refund system be adopted. The Regents then voted to increase the fee but to change the compulsory funding mechanism. No one testified at trial that the fee increase was intended to make up for losses that refundability would cause, nor does the Regents' resolution adopting a refund feature make any such claim.[4] The amount of money lost is beside the point. If any measurable loss has occurred, and if the motivation of those inflicting the loss is forbidden by the First Amendment, plaintiffs have a right to judicial relief.[5]
 
 
 12
 Furthermore, apart from the economic effect of the Regents' decision, it is clear that it conveyed the impression that the Daily would be losing funds as a result of the fee change. One of the reasons that President Magrath offered to the Regents in support of the refund system was that the threat of losing financial support from students would promote responsible journalism. Tr. 526. As stated in the District Court's opinion, this effect was acutely felt by the plaintiff editors, who on several occasions altered the content of the paper out of fear of further reprisals by the Regents. Since the Regents' decision as its natural result caused this chilling effect, the decision must be considered adverse to the plaintiffs.
 
 III.
 
 13
 As to whether the Regents' decision was substantially motivated by the content of the "Humor Issue," the District Court found that the Regents did not intend to punish the plaintiffs or deprive them of any constitutional rights and that "[o]ne of the motivations for establishment of the refundable fee system was to respond to the concerns of those students who objected to being coerced into giving financial support to the Daily." Slip op. at 8. We assume for present purposes that this is a constitutionally permissible motivation.[6] On the other hand, it is clear that the First Amendment prohibits the Regents from taking adverse action against the Daily because the contents of the paper are occasionally blasphemous or vulgar. See Papish v. Univ. of Missouri Curators, supra, 410 U.S. at 670, 93 S.Ct. at 1197 (offense to good taste, no matter how great, does not justify restriction of speech); Pratt v. Independent School Dist. No. 831, 670 F.2d 771, 773 (8th Cir.1982) (school board may not ban films because of religious or ideological content).
 
 
 14
 We have here a case of mixed motives. The Supreme Court has laid down the rule for such cases in Mt. Healthy School Dist. v. Doyle, supra, 429 U.S. at 287, 97 S.Ct. at 576. Doyle was an employment case--discharge of a public employee allegedly in retaliation for the exercise of First Amendment rights--but its analytical framework is useful here. If the Board of Regents would have changed the funding mechanism simply because of students' objections, it should prevail here, even if opposition to the Daily's contents was also in the Board's collective mind. But on this question of fact the Board has the burden of proof. It must show by a preponderance of the evidence that the permissible motive would have produced the adverse result, even in the absence of the impermissible motive. This allocation of the burden favors the party asserting First Amendment rights, and we think properly so. Once a plaintiff has come forward with some substantial evidence of illegal retaliation, it should be difficult for a defendant to prevail; placing the burden of proof on the defendant is the law's way of creating this difficulty.
 
 
 15
 The District Court found that one of the Board's motives was an objective we assume to be legitimate. It did not find what the Board's other motive or motives were. In this posture, we should ordinarily remand this case for further findings by the trier of fact. Here, however, we think a finding either that the Board had no improper motivation, or that its proper motivation alone would have produced the adverse action, would be clearly erroneous. Remand is therefore not necessary.
 
 
 16
 Evidence of the Regents' improper motivation was clearly brought out in the testimony. Several Regents testified that one of the reasons that they voted in favor of the resolution was that students should not be forced to support a paper which was sacrilegious and vulgar. Tr. 530, 531, 532, 536 (Regent Casey); Tr. 769, 779, 781 (Regent Peterson); Pls.Ex. 722 at 1, 2, 4 (Regent McGuiggan); Tr. 551, 552 (Regent Goldfine);[7] Tr. 459, 461, 465-66 (Regent Krenik); Pls.Ex. 720 at 1, 5 (Regent Latz). The enormous political pressure that was brought to bear[8] and the Regents' two resolutions which deplore the contents of the "Humor Issue" also furnish strong evidence that the Regents were reacting to the contents of the paper and to the disapproval that others expressed of those contents.
 
 
 17
 Finally, it is significant that the Regents did not move to establish a refund system at the Duluth, Morris, or Waseca campuses of the University. Testimony at trial showed that the student-funded newspapers at each of these campuses regularly published articles of a partisan nature, took stands on controversial subjects, and endorsed candidates for office on all levels, from college positions to the Presidency of the United States. If the Regents had truly been motivated by the principle that a student ought not be forced to support a newspaper that espouses views the student opposes, then one would expect that they would have taken some action in regard to the newspapers at the other campuses. Yet in 1980 when the refund system was instituted, the Regents took no such action. No motion was even made that the Board conduct a study of the feasibility of instituting the refund system at the other schools. In 1981, a motion to institute the refund system at these other schools was made and defeated.
 
 IV.
 
 18
 Having found that the District Court erred in denying the plaintiff's First Amendment claim, we must now consider the defendants' argument that the Regents' decision to establish the refund system is a legislative act and hence that they are immune from Sec. 1983 liability under the doctrine of legislative immunity. We reject this argument.[9] The Regents do not qualify as legislators within the meaning of the legislative-immunity doctrine. Although the Regents are given the power "to enact laws for the government of the university" (Territorial Laws of Minnesota, 1851, Chapter 3, Section 9, applicable today by virtue of the Minnesota Constitution, Article XIII, Section 3), they are essentially administrators who oversee the operation of a state educational institution. See Williams v. Anderson, 562 F.2d 1081, 1101 (8th Cir.1977) (legislative immunity does not apply to executive or administrative officials). Their rule-making powers are limited solely to the regulation of that institution. That state law may characterize their activity as "legislative" for some purposes is not controlling in the interpretation of a federal statute such as 42 U.S.C. Sec. 1983.
 
 
 19
 There are instances in which the members of bodies other than state legislatures may have legislative immunity from suit under Sec. 1983. See Lake Country Estates v. Tahoe Planning Agency, 440 U.S. 391, 404-05, 99 S.Ct. 1171, 1178-79, 59 L.Ed.2d 401 (1979). The governing body of a state-supported institution of higher learning, we think, cannot qualify for such protection. Such a rule would leave such bodies too free to violate the Constitution. For example, if defendants' argument is accepted, they could adopt a rule forbidding the admission of any Baptists, and no Sec. 1983 suit could do anything about it. The argument proves too much. "To state [the proposition]," as Mr. Chief Justice White was fond of remarking, "is to answer it." Toledo Newspaper Co. v. United States, 247 U.S. 402, 419, 38 S.Ct. 560, 564, 62 L.Ed. 1186 (1918).
 
 
 20
 The judgment of the District Court is reversed, and the cause is remanded for issuance of appropriate injunctive relief consistent with this opinion.
 
 
 21
 It is so ordered.
 
 
 
 *
 The Hon. Luther M. Swygert, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 We do not reach plaintiffs' claims under the Equal Protection Clause and Art. I, Sec. 3, of the Constitution of Minnesota
 
 
 [2]
 Since approximately 1920, the Daily has received part of its funding from the Board of Student Publications, which in turn has received its funding from the student-service fee that students are charged as a condition of registration. Until the Regents' decision in May of 1980, University regulations did not allow students to obtain a refund of that portion of the student-service fee which is allotted to the Board of Student Publications
 At the time this lawsuit was brought, approximately 23 student organizations and activities at the Twin Cities campuses besides the Board of Student Publications received funds from the student-service fee for which no refund could be obtained by students who objected to supporting any of these organizations. Two organizations, a student health service and MPIRG (a non-student public-interest group), received funding from service fees for which students can obtain refunds.
 
 
 [3]
 Regents Lebedoff, Schertler, and Unger voted no
 
 
 [4]
 Indeed, President Magrath's statement to the Regents clearly anticipates that the Daily would suffer some financial loss
 In all probability, (this is speculative, of course) the proposal will not cripple the Daily's financial base, which is an important consideration if we want to preserve it as a viable student newspaper.
 Pls.Ex. 77, p. 3.
 
 
 [5]
 If the Regents could show that refundability and the fee increase were tied together, so that refundability would never have been approved if the fee had not been raised, a different result might follow, by analogy to the Mt. Healthy rule, discussed below, allowing government to take adverse action, even though partly actuated by an impermissible motive, if it can prove by a preponderance of the evidence that it would have taken the same action anyway for a separate and legitimate reason. The District Court made no such finding, and there is insufficient evidence in this record to support it, in any event. Moreover, it is arguable that where the freedom of the press is involved, no such complicated economic analysis should be undertaken in an attempt to justify action that on its face abridges that freedom. Cf. Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue, --- U.S. ----, 103 S.Ct. 1365, 1372-75, 75 L.Ed.2d 295 (1983) (special tax for newspapers struck down, even though over-all burden of taxation might be less on newspapers than on other businesses; complexities of economic proof too great, and error of analysis too likely)
 
 
 [6]
 In fact, students may have a First Amendment right not to be forced to buy a newspaper with which they disagree. Certainly a state could not pass a law requiring its residents to buy a particular newspaper, or any newspaper, for that matter. See Abood v. Detroit Bd. of Educ., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); West Virginia Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). On the other hand, the University may be within its rights in treating the Daily as a kind of bulletin board containing notices it wants students to see. It cannot make the students read a bulletin board, but it can buy one with compulsory student fees. We express no view on these questions. They are not squarely presented here. Whether, for example, the University could choose, or be legally compelled, to abandon compulsory funding of publications at all its campuses, is not an issue we must decide here. The question before us is narrow: the validity of a change in funding at one campus designed to retaliate against the exercise of First Amendment rights. Nor do we hold that the University must support any student publications whatever. As far as the First Amendment is concerned, the University could certainly choose not to own or support any newspapers, so long as its motivation is permissible
 
 
 [7]
 Regent Goldfine was absent from the meeting in 1980 when the initial resolution was passed but voted in favor of the refund system in 1981
 
 
 [8]
 On July 13, 1979, at a meeting of the Board of Regents, Regent Peterson stated:
 I think probably the thing that maybe concerns us the most, not to slight the citizenry, but the legislators in my five years on this Board are more upset with what's transpired in that issue than anything that I have experienced on this Board.
 Pls.Ex. 705.
 
 
 [9]
 The District Court did not reach this issue because it found in favor of the defendants on all of plaintiffs' substantive claims. We nevertheless consider it because if we agreed with defendants we could affirm on this ground. A judgment may be affirmed on any ground fairly apparent in the record, whether or not raised or passed on below. See, e.g., Brown v. St. Louis Police Dept., 691 F.2d 393, 396-97 (8th Cir.1982)
 The defendants, in addition, argue that they are immune under the doctrine of qualified or good-faith immunity. This defense is of no avail. Qualified immunity applies only to damages, not to equitable relief, Brown v. Bathke, 566 F.2d 588, 593 (8th Cir.1977), and plaintiffs here seek only an injunction.