KELLY, Circuit Judge,
concurring.
I join the court’s well-reasoned opinion in full, but write separately to respond to the dissenting opinion.
A.
Qualified immunity “ ‘does not require a case directly on point’ for a right to be clearly established,” White, 137 S.Ct. at 551 (alterations omitted) (quoting Mullenix v. Luna, — U.S. -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015)), nor does it require that “the very action in question has previously been held unlawful,” Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Rather, “‘[t]he salient question is whether the state of the law1 at the time of an incident provided ‘fair warning’ to the defendants ‘that their alleged conduct was unconstitutional.’ ” Tolan v. Cotton, — U.S. -, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (per curiam) (alterations omitted) (quoting Hope, 536 U.S. at 741, 122 S.Ct. 2508). The same standard applies to university officials in cases involving the First Amendment. See, e.g., Putnam v. Keller, 332 F.3d 541, 549 (8th Cir. 2003) (denying qualified immunity to public college administrators for violations of former instructor’s First Amendment rights); Burnham v. Ianni, 119 F.3d 668, 676-77 (8th Cir. 1997) (en banc) (rejecting university chancellor’s claim that the law was not clearly established where “the suppression [of speech] was unreasonable both in light of the purpose served by the forum and because of its viewpoint-based discrimination”).
The entitlement to qualified immunity is judged based on the law at the time that a public official makes his or her decision and does not take into account later changes in the law. See Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014); al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074 (determining whether “existing precedent” clearly established the right “at the time of the challenged conduct”); Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (examining “cases of controlling authority in their jurisdiction at the time of the incident”). At the time of the challenged actions in fall 2012, the defendants were on notice of several cases that clearly established that their conduct violated plaintiffs’ First Amendment rights. In at least four cases, the Supreme Court has held that a university creates a limited public forum when it distributes benefits to recognized student groups. See Martinez, 561 U.S. at 685, 130 S.Ct. 2971 (“[A] university generally may not withhold benefits from student groups because of their ... outlook.”) (citing Rosenberger, 515 U.S. at 841, 115 S.Ct. 2510 (provision of funds from student activities fee); Widmar, 454 U.S. at 269, 102 S.Ct. 269 (holding meetings in university facilities); Healy, 408 U.S. at 181-82, 92 S.Ct. 2338 (use of campus bulletin boards, school newspaper, and campus meeting space)); see also Gohn, 850 F.2d at *711 362 (dissemination of project-based university funds). In every case, the Court held that the university must accord the benefits associated with recognized student group status in a viewpoint neutral manner. See Martinez, 561 U.S. at 686, 130 S.Ct. 2971 (“In all three cases[, Rosenber-ger, Widmar, and Healy,] we ruled that student groups had been unconstitutionally singled out because of their points of view. ‘Once it has opened a limited [public] forum, ... [t]he State may not ... discriminate against speech on the basis of ... viewpoint.’ ” (second and final alterations in original) (quoting Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510)).
Here, it is undisputed that ISU granted recognized status to NORML ISU as a student organization. In accordance with the Student Organization Recognition Policy, to achieve recognized status, ISU concluded that NORML ISU’s purpose was “consistent with the broad educational mission of the university,” but it made clear that it “does not support or endorse the purposes” of any registered organizations, including NORML ISU. The Policy further provides that “recognized organizations are accorded special privileges and benefits,” including the ability to use the University’s name and marks in accordance with the Trademark Guidelines. Like the opportunity to request funds from the student activities fund in Rosen-berger or the availability of campus meeting space in Widmar, ISU’s decision to grant recognized organizations “the privilege of using [ISU’s] marks” created a limited public forum, and ISU cannot accord that privilege on the basis of the organization’s viewpoint. See Gohn, 850 F.2d at 362 (“The University need not supply funds to student organizations; but once having decided to do so, it is bound by the First Amendment to act without regard to the content of the ideas being expressed.”); see also Schiff v. Williams, 519 F.2d 257, 261 (5th Cir. 1975) (“[University] President Williams cannot avoid responsibility for his abridgment of First Amendment rights because his motives were to serve the best interest of the school.”).
These factually analogous precedents are no less apposite simply because the court cites no case addressing a trademark licensing program. “[OJfficials can still be on notice that their conduct violates established law even in novel factual circumstances.” Hope, 536 U.S. at 741, 122 S.Ct. 2508. The dissent highlights the fact that the trademark program allowed student groups to place ISU’s symbols “side-by-side with a student organization’s message.” This was also the case in Rosenber-ger, where the name of the religious group petitioning for funds included the university’s name in the title of its publication, 515 U.S. at 826, 115 S.Ct. 2510, and in Martinez, where the law school allowed officially recognized groups to use its name and logo, 561 U.S. at 670, 130 S.Ct. 2971. These facts did not affect the Court’s application of forum analysis in those cases. Cf. Rosenberger, 515 U.S. at 832, 115 S.Ct. 2510 (concluding that the university could not “escape the consequences” of the court’s prior prohibition on viewpoint discrimination by arguing that “this case involves the provision of funds rather than access to facilities”). These cases clearly established that ISU created a limited public forum and that viewpoint discrimination is prohibited in such a forum.[2]
*712 B.
Adopting ISU’s argument, the dissent posits that it is not clearly established that ISU’s policy [3] of permitting student organizations to use the University’s marks is not government speech. At the time of the challenged conduct, defendants could have been aware of only two of the government speech cases cited by the dissent, as the rest post-date the events at issue by several years. See Mitchell v. Forsyth, 472 U.S. 511, 535, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (“The decisive fact is ... that the question was open at the time he acted.”). With respect to those two cases, it is hard to see how Summum, 555 U.S. at 464, 129 S.Ct. 1125, a case concerning the private donation of monuments to a public park, or Knights of Ku Klux Klan v. Curators of Univ. of Missouri, 203 F.3d 1085, 1093 (8th Cir. 2000), a case concerning the “very different context of public television broadcasting,” could have disrupted the. well-established Supreme Court precedent holding that a university’s dissemination of benefits to student groups is not government speech.
Rosenberger rejected an argument indistinguishable from that offered by ISU to support its actions. There, the university argued that it was entitled to decide whether to pay printing costs on behalf of student publications based on the publications’ religious perspective. 515 U.S. at 833-35, 115 S.Ct. 2510. The Court rejected this argument, explaining that- viewpoint discrimination is improper “when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.” Id. at 834, 115 S.Ct. 2510. It was evident to the Court that there was a “distinction between the University’s own favored message and the private speech of students” because the university disclaimed any control over the student group or any approval of the “organizations’ goals or activities.” Id. at 824, 834-35, 115 S.Ct. 2510.
The resemblance to the present case is striking. Similar to the policy in Rosenber-ger, the Student Organization Recognition Policy provides that the mission of ISU’s student organization program is, in part, to “increase and support diversity in the university community” because “[diversity enlivens the exchange of ideas, broadens scholarship, and prepares students for lifelong, productive participation in society.” It further states that even though ISU may recognize a student group, it “does not support or endorse the purposes” of any registered student organizations. Three of the defendants unequivocally testified that a student organization’s use of an ISU mark does not indicate that the university endorses or supports the organization’s message. In a further act of separation, the Trademark Guidelines require language or design details “to show how an Organization is connected to the Universi *713 ty,” such as “the verbiage ‘club,’ ‘student chapter’, or other nomenclature.” Furthermore, by permitting a vast number of student groups to promote their own contradictory messages using the university’s name and marks, ISU continues a long university tradition of fostering the diverse viewpoints of its student body, not communicating a message from the university. See id. at 835-36, 115 S.Ct. 2510; id. at 850, 115 S.Ct. 2510 (O’Connor, J., concurring); Martinez, 561 U.S. at 704-05, 130 S.Ct. 2971 (Kennedy, J., concurring) (“Extracurricular activities ... facilitate interactions between students, enabling them to explore new points of view, to develop interests and talents, and to nurture a growing sense of self.... A law school furthers these objectives by allowing broad diversity in registered student organizations.” (internal citations omitted)); Bd. of Regents v. Southworth, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (expressive activities undertaken by registered student organizations “spring[ ] from the initiative of the students, who alone give [them] purpose and content in the course of then-extracurricular endeavors”). Given the undisputed facts and their placement in the university context, any purported concern that ISU’s message “would be attributed to the University is not a plausible fear.” Rosenberger, 515 U.S. at 841, 115 S.Ct. 2510. Defendants were not entitled to rely on the government speech doctrine where no one would “routinely — and reasonably — interpret” ISU’s name and mark on a student organization t-shirt as the university’s expressive conduct. Summum, 555 U.S. at 471, 129 S.Ct. 1125.
The dissent’s contention that the government speech issue warrants qualified immunity appears to be based in large part on defendants’ actions in response to NORML ISU and to the “widespread adverse public reaction to the Register article.” [4] I can find no court that has examined the government speech issue so narrowly. Instead, we must look at the nature of the government program or policy. See Summum, 555 U.S. at 467, 129 S.Ct. 1125 (“The parties’ fundamental disagreement thus centers on the nature of petitioners’ conduct when they permitted privately donated monuments to be erected in Pioneer Park. Were petitioners engaging in their own expressive conduct? Or were they providing a forum for private speech?”); Knights of Ku Klux Klan, 203 F.3d at 1093 (examining “the central purpose of the enhanced underwriting program”). The question here is not whether NORML ISU or the public’s actions justified ISU’s response, but rather whether ISU’s program of permitting student organizations to use the ISU name and marks constitutes ISU’s “own expressive conduct.” Summum, 555 U.S. at 467, 129 S.Ct. 1125. As discussed above, the defendants, the university, and the public do not “often closely identify]” student organization t-shirts bearing ISU marks with the expressive conduct of the university. Id. at 472, 129 S.Ct. 1125. In fact, as the court aptly notes, the only time any purported confusion arose regarding the appearance of University endorsement for a message on a student organization t-shirt was in the present case. Cf. Bd. of Educ. v. Mergens By & Through Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality op.) (“We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support stu *714 dent speech that it merely permits on a nondiscriminatory basis. The proposition that schools do not endorse everything they fail to censor is not complicated.” (internal citations omitted)). No reasonable university- official could have relied on this single example of confusion, in a field of at least 2,195 student organization uses of ISU marks, to convert a historic forum for student speech into government speech.[5]
C.
The dissent ultimately acknowledges that “ISU created a limited public forum when it licensed hundreds of student organizations to use ISU’s trademarks to enhance the students’ public speech.” However, it declines to accept the detailed and rigorous findings of the district court that clearly demonstrated that ISU engaged in impermissible viewpoint discrimination. Instead, the dissent contends — despite the argument not being raised by ISU — that the university engaged in permissible content regulation.
Even if defendants had raised the defense of content regulation in the manner presented by the dissent, this theory would not entitle defendants to qualified immunity. In a limited public forum, the state may “confin[e] the forum to the limited and legitimate purposes for which it was created” by “reserving it for certain groups or for the discussion of certain topics.” Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510. But there are “constitutional constraints on the boundaries the State may set:” It “ ‘may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, ... nor may it discriminate against speech on the basis of ... viewpoint.’ ” Martinez, 561 U.S. at 685, 130 S.Ct. 2971 (alterations in original) (quoting Rosenberger, 515 U.S. at 829, 115 S.Ct. 2510). Assuming the dissent’s purported purpose for the forum— “to protect and promote ISU’s public image” — were the one the defendants would advocate,[6] the rationales offered for excluding NORML ISU from the forum are not reasonable or viewpoint-neutral.
First, the dissent suggests that NORML ISU was targeted because its t-shirt conveyed the “perception that ISU endorses the message.” If that were the rationale, ISU presumably would have rejected the design in the first instance. It did not do so. Instead, ISU approved the design, never mentioning any concern that the t-shirt conveyed the perception of university endorsement. With ISU’s approval, the t-shirts were made, distributed, and worn by NORML ISU members. Only when NORML ISU and the t-shirts received news coverage did ISU act. “Participants in a [limited public] forum, declared open to speech ex ante, may not be censored ex post when the sponsor decides that particular speech is unwelcome.” Hosty v. Carter, 412 F.3d 731, 737 (7th Cir. 2005). No reasonable university official could have believed that post facto closing a forum *715 that was previously open was a permissible exercise of content discrimination.
“The existence of reasonable grounds for limiting access to a nonpublic forum ... will not save a regulation that is in reality a facade for viewpoint-based discrimination.” Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 811, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The facade is evident here: ISU did not uniformly bar student groups from using its marks when the product “eonvey[ed] the perception that ISU endorse[d] the message.” For example, ISU approved a t-shirt which included “Just Proud” on the front and “ISU LGBTA Alliance” on the back; a vinyl banner that said “ISU Tea Party” with the ISU mascot holding a Tea Party flag; a t-shirt with.the ISU Cuffs[7] logo including a pair of handcuffs on the front and a message stating “Play Hard” on the back; and a banner that stated “Choose Peace Choose Life!” sponsored by the “Students for Life Club at Iowa State University.” ISU’s decision to permit these groups to use ISU marks but to deny NORML ISU’s t-shirt submissions was not reasonably based on a distinction in the perception of university endorsement. “From no other group does [ISU] ’require the sterility of speech that it demands of [NORML ISU],... This is blatant viewpoint discrimination.” Good News Club v. Milford Cent. Sch., 533 U.S. 98, 124, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (Scalia, J., concurring); see Stanley v. Magrath, 719 F.2d 279, 284 (8th Cir. 1983) (concluding that the defendants’ decision to reduce a student newspaper’s funding was improperly motivated by the content of an issue because “[i]f the Regents had truly been motivated by [a viewpoint neutral justification], then one would expect that they would have taken some action in regard to the newspapers at the other campuses”).
ISU’s alleged concern that the public would perceive endorsement was limited to one group whose message it disagreed with. Since at least 1972, it has been clearly established that “[t]he College, acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent.” Healy, 408 U.S. at 187-88, 92 S.Ct. 2338. Rather than revoke NORML ISU’s permission and subject it to unique scrutiny, “the school’s adherence to a rule of viewpoint neutrality in administering its [trademark] program would prevent ‘any mistaken impression that [NORML ISU] speakfe] for the University.’ ” Southworth, 529 U.S. at 233, 120 S.Ct. 1346 (quoting Rosenberger, 515 U.S. at 841, 115 S.Ct. 2510). Defendants failure to follow this clearly established rule makes qualified immunity inappropriate.[8]
Second, the dissent contends that ISU could have reasonably denied NORML ISU’s t-shirt design because it “appear[ed] to link ISU to unsafe or illegal activities *716 such as illegal drug use.” Assuming such a restriction on a limited public forum is proper, ISU had no such provision in its Trademark Guidelines, nor did it rely on this rationale when it rejected NORML ISU’s reorder of T-Shirt Design #1. The court cannot grant defendants qualified immunity based on a forum limitation they did not assert. Nor is such a limitation supported by our case law. No court of appeals has applied Morse v. Frederick, 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) in a university setting. And, Justice Alito’s controlling concurrence states that the case “provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as the wisdom of the war on drugs or of legalizing marijuana for medicinal use.” Id. at 422, 127 S.Ct. 2618 (Alito, J., concurring) (internal quotation marks omitted). Defendants, and even the dissent, acknowledge that T-Shirt Design #1 conveyed NORML ISU’s support for the legalization of marijuana, making Morse inapplicable. Even if NORML ISU did advocate illegal drug use, defendants were on notice that student organization “speech about an illegal activity would still be protected by the First Amendment.” Gohn, 850 F.2d at 368 (rejecting the university’s argument that it could refuse to fund a gay and lesbian student group because “sodomy is illegal in Arkansas”).
The district court properly denied the defendants qualified immunity.

. Even if the trademark licensing program were a nonpublic forum, it was clearly established by fall 2012 that viewpoint discrimination was equally prohibited in such a forum. See Child Evangelism Fellowship of Minnesota v. Minneapolis Special Sch. Dist. No. 1, 690 F.3d 996, 1001 n.1 (8th Cir. 2012) ("[B]e-cause the district's exclusion of CEF from the *712 after-school program is viewpoint-based, there is no need to analyze the nature of the forum of the after-school program.... Even in a nonpublic forum, restrictions must be viewpoint neutral.”); Burnham, 119 F.3d at 675 ("[T]he nature of the forum makes little difference” in the qualified immunity analysis because "viewpoint-based discrimination” is impermissible in all forums).

. The dissent avers that “ISU's general licensing requirements” state that ISU would not approve "products considered dangerous or offensive,” including "products causing, potential health risks, promoting firearms, drugs, alcohol, gaming or tobacco.” Even if this prohibition on certain products applied to the t-shirts at issue, the policy from which the dissent quotes appears to apply only to "external and/or commercial uses of the Marks,” which is not applicable to the student organization here.

. Aside from contacts from government officials, the record contains evidence of only three comments directed at ISU from parents of former or current students regarding the NORML ISU t-shirt.

. Compared to the long history of the First Amendment, the government speech doctrine may be considered "recently minted,” Summum, 555 U.S. at 481, 129 S.Ct. 1125 (Stevens, J., concurring), or "relatively new,” Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550, 574, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005) (Souter, J., dissenting), but it dates back at least to 1991, see Summum, 555 U.S. at 481, 129 S.Ct. 1125 (Stevens, J., concurring) (citing Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)), long before the speech at issue here.

. In its briefing, ISU stated that the purpose of its trademark program was to "reflect[] the University’s rightful commitment to fostering diverse forms of civic engagement and intellectual exploration and debate.”

. Cuffs is a registered student group at ISU organized around alternative sexual practices such as kink, fetish, and BDSM.

. The dissent’s reliance on Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) is misplaced. That case concerned whether "educators may exercise editorial control over the contents of a high school newspaper produced as part of the school’s journalism curriculum.” Id. at 262, 108 S.Ct. 562. Setting aside whether the case is applicable in the university context, see McCauley v. Univ. of the Virgin Islands, 618 F.3d 232, 242-47 (3d Cir. 2010), it expressly limited its holding to activities "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.” Hazelwood, 484 U.S. at 271, 108 S.Ct. 562. Because neither of these elements are present here, no reasonable university official would have relied on Hazelwood in the present case.